SCE Envtl. Group, Inc. v Murnane Bldg. Contrs., Inc. (2023 NY Slip Op 51326(U))

[*1]

SCE Envtl. Group, Inc. v Murnane Bldg. Contrs., Inc.

2023 NY Slip Op 51326(U)

Decided on December 4, 2023

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 4, 2023
Supreme Court, Albany County

SCE Environmental Group, Inc., Plaintiff,

against
Murnane Building Contractors, Inc. and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, Defendants. JOHN DOE ## 1-12, Third-Party Defendants.
MURNANE BUILDING CONTRACTORS, INC., Third-Party Plaintiff,
against
CLASSIC ENVIRONMENTAL, INC., Third-Party Defendant.
THE OAK GROUP, INC., Plaintiff,
against
SCE ENVIRONMENTAL GROUP, INC., MURNANE BUILDING CONTRACTORS, INC. and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, Defendants.
CLASSIC ENVIRONMENTAL, INC., Plaintiff,
against
MURNANE BUILDING CONTRACTORS, INC., PATRICK T. MURNANE, JAMES R. HOGEL, and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, Defendants.

Index No. 905770-17

Greenspoon Marder LLP
Attorneys for SCE Environmental Group, Inc.
(Carol A. Sigmond and Joshua M. Deal, of counsel)
590 Madison Avenue, Suite 1800
New York, New York 10002
Hinckley, Allen & Synder LLP
Attorneys for Murnane Building Contractors, Inc., James Hogel, Patrick T. Murnane, and Co-counsel for Travelers Casualty and Surety Company of America
(Jeremy M. Smith, Janelle A. Pelli and Joseph Muccio, of counsel)
30 South Pearl Street, Suite 901
Albany, New York 12207
Dreifuss Bonacci & Parker, PC
Co-counsel for Travelers Casualty and Surety Company of America
(David C. Dreifuss and Paul H. Mandal, of counsel)
26 Columbia Turnpike
Florham Park, New Jersey 07932
John J. Carusone, Jr., Esq.
Attorney for The Oak Group, Inc.
491 Broadway, PO Box 478
Saratoga Springs, New York 12866
Byrne, Costello & Pickard, P.C.
Attorneys for Classic Environmental, Inc.
(Jordan R. Pavlus, of counsel)
100 Madison Street, Tower I, Suite 1600
Syracuse, New York 13202-2721

Richard M. Platkin, J.

The three above-captioned actions arise from a public construction project commenced by the New York State Office of General Services ("OGS") in 2016. The cases were consolidated for pretrial discovery, which is complete, and the parties in each action now move for summary judgment.
I. BACKGROUND
A. The Parties and the Project
In 2016, OGS began a project to renovate Building No. 4 ("Building") on the Harriman State Office Campus in Albany, New York ("Project"). As required by the Wicks Law (see General Municipal Law § 101), OGS engaged multiple prime contractors.
Murnane Building Contractors, Inc. ("MBC") was retained on November 30, 2016 as the prime contractor for general construction work, including demolition and the abatement of hazardous materials (see Action No. 1, NYSCEF Doc No. 375, Ex. A ["Prime Contract"]).[FN1]

Travelers Casualty and Surety Company of America ("Travelers") posted a payment and performance bond for MBC covering the Prime Contract (see NYSCEF Doc No. 7 ["Bond"]).
In February 2017, MBC subcontracted with SCE Environmental Group, Inc. ("SCE") to perform asbestos abatement and related work (see NYSCEF Doc No. 2 ["Subcontract"]). 
SCE subcontracted a portion of its scope of work to Oak Group, Inc. ("Oak") (see Action No. 2, NYSCEF Doc No. 117 ["Oak Subcontract"]). Oak, in turn, claims to have subcontracted with Sunn Enterprises Group, LLC ("Sunn") for the necessary labor, though Oak was unable to produce a written agreement in discovery.
In mid-July 2017, OGS held a responsibility hearing concerning SCE, citing: (i) health and safety violations, including a June 9, 2017 flood incident ("Flood Incident") involving the discharge of asbestos-contaminated water; (ii) unsafe working conditions; and (iii) missed scheduling deadlines (see Albany County Index No. 900380-18 ["OGS Proceeding"], NYSCEF Doc No. 6 at 2-3, 8). SCE accepted responsibility for the deficiencies identified by OGS, [*2]including the Flood Incident, and its focus was on corrective and preventive measures (see OGS Proceeding, NYSCEF Doc No. 42).
On August 2, 2017, MBC issued a written notice of default to SCE (see NYSCEF Doc No. 4). MBC then terminated SCE's Subcontract for cause on August 9, 2017, citing persistent delays and SCE's failure to propose a viable recovery schedule (see NYSCEF Doc No. 5).
MBC subcontracted with Classic Environmental, Inc. ("Classic") on September 13, 2017 to complete SCE's scope of work (see Action No. 3, NYSCEF Doc No. 54 ["Classic Subcontract"]). However, OGS barred Classic's workers from the Project site just six weeks later, following an incident in which Classic inappropriately pressure-washed metal beams containing lead-based paint, which stripped the paint, and then allowed lead-contaminated runoff to spread throughout the Building and discharge into storm sewers ("Lead Incident") (see NYSCEF Doc No. 421).
OGS terminated the Prime Contract on November 13, 2017, citing MBC's delays and its failure to properly manage its subcontractors (see NYSCEF Doc No. 425). OGS also made a demand on the Bond posted by Travelers and retained a completion contractor to complete MBC's scope of work under the Prime Contract.
B. The Lawsuits
SCE commenced Action No. 1 on August 29, 2017, principally seeking damages for MBC's alleged wrongful termination of its Subcontract (see Action No. 1, NYCEF Doc No. 434 ["SCE Complaint"]).[FN2]
MBC and Travelers counterclaim primarily for the damages caused by SCE's alleged breaches of the Subcontract and for indemnification from OGS's claims and their own first-party losses (see NYSCEF Doc No. 435 ["SCE Answer"]).
Oak commenced Action No. 2 on May 23, 2018, seeking to recover (i) the unpaid balance under the Oak Subcontract from the Bond, and (ii) damages from MBC for the use of its construction equipment (see Action No. 2, NYSCEF Doc No. 114 ["Oak Complaint"]).[FN3]
MBC and Travelers counterclaim against Oak for negligence and indemnity (see NYSCEF Doc No. 115 ["Oak Answer"]).
Classic commenced Action No. 3 in Oneida County on May 14, 2018 against MBC, Travelers and two individuals associated with MBC, principally seeking recovery of the unpaid balance under the Classic Subcontract. Upon MBC and Travelers' motion, the case was transferred to Albany County and joined with Action Nos. 1 and 2 for discovery (see Action No. 3, NYSCEF Doc No. 29). MBC and Travelers countersue Classic for breaches of the Classic Subcontract and for indemnity.
In addition to the three lawsuits between MBC and its lower-tier contractors, this Court presided over a 2018 CPLR article 78 proceeding brought by SCE challenging OGS's determination of non-responsibility. By Decision, Order & Judgment dated July 5, 2018, the undersigned annulled the non-responsibility determination purely on procedural grounds and remitted the matter to OGS for redetermination (see OGS Proceeding, NYSCEF Doc No. 57 at 11-14).
Finally, MBC and Travelers sue the State in the Court of Claims, alleging that OGS wrongfully terminated MBC's Prime Contract (see Claim No. 133935 ["Court of Claims Case"], NYSCEF Doc No. 24). Dispositive motions are pending before the Court of Claims.
II. MOTIONS DIRECTED AT SCE'S COMPLAINT
A. Wrongful Termination of Subcontract (1st Cause of Action)
SCE alleges that MBC wrongfully terminated the Subcontract (see SCE Complaint, ¶¶ 44-55), and it moves for summary judgment on its claim. MBC cross-moves for dismissal.
1. Relevant Portions of the Subcontract
Under article 9, entitled "Default and Termination," SCE "shall be in default if [it] fails to progress its Work according to the Schedule, as revised from time to time by [MBC]" (Subcontract, art 9, § 1 [a], [g]).
"If [SCE] fails within two working days after receipt of a written notice to commence and continue satisfactory correction of such default with diligence and promptness, then [MBC], without further notice, and without prejudice to any other rights or remedies, may . . . [t]erminate [SCE's] right to proceed with the work . . . and use any materials, implements, equipment, appliances or tools furnished by or belonging to [SCE] to complete [SCE's] work" (id., § 2 [c]).
2. MBC's Grounds for Termination
At the outset, the Court rejects SCE's contention that MBC terminated the Subcontract for reasons other than those stated in its August 2, 2017 notice of default (see Action No. 1, NYSCEF Doc No. 403 ["Notice of Default"]).[FN4]

The Notice of Default recited, in relevant part:
The rate of asbestos removal and waste-out on this project remains insufficient, SCE continues to fall further behind schedule, and SCE has not presented a viable work plan and schedule. SCE is hereby on notice that it has 48 hours to provide an acceptable work plan and project schedule, and add sufficient manpower, supervision, and equipment to maintain the project schedule . . . . If SCE fails to meet this demand, on Monday, August 7, 2017, [MBC], without any further notice, will hold SCE in default . . . and will pursue any or all of the options described under Article 9 of the Subcontract Agreement.
In suggesting that the Subcontract was terminated for other reasons, SCE relies on language in MBC's August 9, 2017 termination letter (see NYSCEF Doc No. 431 at 6) referring to SCE's "poor project management, lack of qualified workers, a flood, and numerous OGS and NYS Department of Labor health and safety violations in asbestos abatement" (NYSCEF Doc No. 5 ["Termination Letter"]).
It is clear from the context, however, that MBC was summarizing the deficiencies raised by OGS at SCE's July 14, 2017 responsibility hearing to make the point that SCE had "fallen even further behind schedule" in the weeks following the hearing (id.). But MBC's stated basis for termination of the Subcontract was SCE's failure to comply with the Notice of Default by providing a "work plan and updated project schedule within two business days . . . on how [SCE] proposed to complete its work by the . . . contract deadline" (id.).[FN5]

[*3]3. Lack of Baseline Schedule
SCE argues that MBC's termination of the Subcontract for delay was wrongful because OGS failed to provide MBC with a baseline schedule for the entire Project ("Baseline Schedule"), and MBC therefore had no basis to deem SCE's work untimely.
SCE's argument is based on the following language within Article 3 of the Subcontract, entitled "Schedule of Subcontractor's Work":
1. [SCE] knows that [MBC] must complete the work of the Prime Contract on or before September 15, 2018, and it is therefore understood and agreed that that the Subcontract Work shall be entirely completed on or before September 15, 2018 (Subcontract Completion Date) and to that end [SCE] will perform the amount of Work that is necessary to permit [MBC] and other subcontractors to complete their work in the time allowed under the Prime Contract.
2. [SCE] agrees to perform its Work in the sequence and within the time specified in the construction schedule for this Project as prepared and as revised from time to time by [MBC]. [MBC] shall have the right to determine the time, order and priority in which the various parts of the Subcontract Work shall be performed. According to SCE, the term "Project" is defined in the Subcontract as pertaining to the entire renovation Project (see Subcontract at 1),[FN6]
and OGS failed to supply a Baseline Schedule reflecting the work of all three prime contractors until December 2018, more than 16 months following SCE's termination. SCE argues that the absence of a Baseline Schedule hampered its ability to create a recovery schedule and left MBC unable "to establish that SCE was delaying the Project" (NYSCEF Doc No. 431 at 13).
In interpreting the Subcontract, the Court must be "guided by basic principles of contract interpretation which instruct that a contract should be construed to give effect to the parties' intent as gleaned from the four corners of the document itself, provided that its terms are clear and unambiguous" (Elmira Teachers' Assn. v Elmira City School Dist., 53 AD3d 757, 759 [3d Dept 2008], lv denied 11 NY3d 709 [2008]).
"[A] contract should be interpreted according to its plain and ordinary meaning and in such a manner as to give effect to all of its provisions" (id. [citations omitted]). "[E]xcessive emphasis is not placed upon particular words or phrases" (South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 277 [2005]), and "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby" (Atwater & Co. v Panama R.R. Co., 246 NY 519, 524 [1927]).
As MBC correctly observes, the Subcontract does not even refer to a Baseline Schedule, much less make OGS's preparation and delivery of a Baseline Schedule a condition precedent to MBC's right to insist that SCE timely perform its work (see NYSCEF Doc No. 494 at 8-9). Rather, the plain language of Article 3 obliged SCE to perform its work in accordance with a schedule "as prepared and as revised from time to time by [MBC]" (Subcontract, art 3, § 2).
The Subcontract gave MBC "the right to determine the time, order and priority" in which SCE's work was to be performed (id.), and SCE was obliged to perform its work at a rate [*4]sufficient to allow MBC to complete the entire Prime Contract within the time allotted by OGS (see id., § 1).[FN7]
And if SCE failed "to supply materials or workers so as to progress its Work in accordance with [MBC's] schedule," MBC could take over SCE's work (id., art 7, § 9). 
Moreover, contrary to the arguments now being advanced by its counsel, SCE's corporate representative, Nate Butler, fully acknowledged in his deposition that "the schedule that [MBC] was to be completing as per their [Prime C]ontract with OGS and the schedule [SCE] had [with MBC], were two different schedules" (NYSCEF Doc No. 497 at 58-59, 141; cf. Bast Hatfield, Inc. v Joseph R. Wunderlich, Inc., 78 AD3d 1270, 1274 [3d Dept 2010]). 
The Court therefore rejects SCE's contention that the "only schedule [it] was contractually bound to follow was the [Baseline Schedule]" (NYSCEF Doc No. 565 at 4). The Subcontract obliged SCE to perform under a schedule established by MBC, and the Notice of Default was issued based on SCE's failure to adhere to that contractual obligation.[FN8]

4. Yellow Glue
Next, SCE argues that the discovery of "Yellow Glue" was an unforeseen field condition that entitled it to an equitable extension of time (NYSCEF Doc No. 431 at 13), thereby rendering it improper for MBC to have relied "upon the delay caused by the Yellow Glue removal in its decision to terminate SCE" (id. at 15).
A primary component of SCE's abatement work was the removal and disposal of asbestos fireproofing material (see NYSCEF Doc No. 495, ¶ 6). SCE claims that it discovered a Yellow Glue substance underneath the fireproofing material in or about March 2017 (see id., ¶ 15). MBC vigorously disputes the timing of the discovery, asserting that the parties "discovered a yellow glue material . . . underneath the asbestos fireproofing material on the structural steel and metal decking in the building, in or around July of 2017" (id.).
MBC does not dispute SCE's characterization of the Yellow Glue as an unforeseen condition,[FN9]
but it maintains that SCE's Subcontract was not terminated due to the Yellow Glue. The Notice of Default was issued based on SCE "continu[ing] to fall further behind schedule" without "present[ing] a viable work plan and project schedule," and MBC ultimately terminated the Subcontract based on SCE's failure to timely and properly respond to the Notice of Default.
Even if the Yellow Glue represented an unforeseen field condition that caused or contributed to SCE's delays, and regardless of exactly when the Yellow Glue first was discovered, it remained incumbent upon SCE to respond to the persistent delays cited in MBC's Notice of Default by timely presenting a viable recovery plan addressing the challenges posed by the discovery of the Yellow Glue.
5. Opportunity to Cure
SCE contends that termination of the Subcontract was wrongful because MBC ignored the "immediate steps" it took "to correct the default alleged in the Notice of Default" (NYSCEF Doc No. 431 at 10). It was MBC that "obstructed and ignored [SCE's cure] efforts and terminated SCE without cause" (id.).
Under Article 9, SCE had "two working days after receipt of" the Notice of Default "to commence and continue satisfactory correction of such default with diligence and promptness" (Subcontract, art 9, § 2 ["Section 9.2"]). The Termination Letter recited that SCE did not provide "any type of work plan and updated project schedule within two business days . . . on how [SCE] proposed to complete its work."
In arguing that it took immediate and appropriate steps to cure, SCE relies on the affidavit of its general counsel, Gene Talerico (see NYSCEF Doc No. 105 ["Talerico Aff."]). "Immediately upon receiving the Notice of Default, SCE verbally contacted [MBC] and agreed to conference with its subcontractors and [MBC] as soon as possible to develop an acceleration plan and a revised schedule" (id., ¶ 11 & Ex. B [NYSCEF Doc No. 543]).[FN10]
"[MBC]'s Vice President, James Hogel, represented to SCE that SCE would have the opportunity to correct the issues identified in the Notice of Default" (Talerico Aff., ¶ 12).
On the following day, August 3, 2017, Talerico "provided written notice to [MBC], reiterating SCE's willingness to accelerate and take other corrective action" (id., ¶ 13). "Despite SCE's willingness to meet as early as possible, [MBC] delayed the coordination meeting with SCE and its subcontractors from August 7, 2017 to August 8, 2017" (id., ¶ 14). MBC then "inexplicably canceled the meeting the night before the conference" (id., ¶ 15). SCE nonetheless "proceeded with the meeting, and developed an acceleration plan and revised schedule" (id., ¶ 16).
MBC responds that SCE has not presented any evidence that it commenced efforts at correcting its default within two business days, as required by Section 9.2 (see NYSCEF Doc. No. 494 at 7). MBC asserts that SCE's scheduling of the August 7, 2017 meeting "did not comply with instructions provided in the [Notice of Default] for what measures SCE needed to take to commence and continue satisfactory correction of the default. The fact that [MBC] canceled a meeting with SCE on August 7, 2017 is irrelevant, as any such meeting was not contractually required, would not have satisfied the Subcontract's two-day deadline, and [MBC]'s right to terminate SCE had already been triggered by August 7, 2017" (id. at 8).
The Court concludes that neither side has demonstrated its entitlement to summary judgment on this point. SCE has submitted proof that it commenced efforts to cure the alleged default within two business days of the Notice of Default through oral and written communications with Hogel directed at scheduling a meeting with MBC and other affected parties to develop a recovery plan satisfactory to MBC. 
Whether those efforts were commenced and continued "with [the] diligence and promptness" required by Section 9.2 depends on the substance of the communications between Talerico and Hogel, which is not addressed in Hogel's affidavit in opposition to SCE's motion (see NYSCEF Doc No. 505, ¶¶ 49-50). If MBC agreed to participate with SCE in a meeting of involved contractors on "August 7, 2017" to "jointly craft a workplan and schedule for the [*5]remainder of" the Project (NYSCEF Doc No. 543), there are legitimate questions as to the adequacy of SCE's efforts to cure, whether MBC waived strict compliance with the timing requirements of Section 9.2 through Hogel's words and conduct, and whether MBC should "be equitably estopped from" denying that SCE commenced and continued efforts at a cure with diligence and promptness (NYSCEF Doc No. 565 at 3).
6. Failure to Make a "Claim" under Article 8
Finally, MBC argues that the cause of action for wrongful termination is barred by SCE's failures to (1) submit a written notice of claim under Article 8 of the Subcontract, and (2) submit the dispute to mediation. The Court concludes that neither argument constitutes a persuasive basis for dismissal. 
Article 8 is directed at "claims for extras or other adjustments" (Subcontract, art 8, § 1), and nothing in its text clearly obliged SCE to file a claim to challenge the termination of the Subcontract. And MBC has not identified any language within the Subcontract showing that the notice obligations of Article 8 were intended to survive the Subcontract's termination.
Further, MBC waived its argument that mediation is a condition precedent to litigation by: (i) failing to plead it as such (see CPLR 3015 [a]); and (ii) actively participating in this litigation for more than six years without raising the issue or requesting a referral to mediation (see Digitronics Inventioneering Corp. v Jameson, 52 AD3d 1099, 1100 [3d Dept 2008]).
7. Conclusion
The present record does not conclusively resolve whether SCE commenced and continued correction of the default alleged in the Notice of Default with diligence and promptness. Accordingly, the branch of SCE's motion for summary judgment on its first cause of action and MBC's cross motion to dismiss that cause of action are denied in accordance with the foregoing.
B. Breach of Subcontract (SCE's 2nd Cause of Action)
SCE alleges that MBC breached the Subcontract by failing to pay monies owed thereunder, including the outstanding contract balance, retainage, the cost of extra work performed at MBC's request, forced acceleration costs, delay damages and change orders (see SCE Complaint, ¶¶ 56-65). In moving for the summary dismissal of the claim, MBC argues that SCE's own prior material breaches of the Subcontract preclude the claim.
For the reasons stated in Part II (A) (5) and (7), the issue of whether MBC properly terminated the Subcontract must be determined at trial. If MBC "wrongfully exercise[d]" its option to terminate under Section 9.2, it may be liable to SCE "for Work actually performed, and equipment and materials supplied to the Project, . . . excluding any lost profits or unabsorbed overhead on Work, materials and equipment not performed or furnished by [SCE]" (Subcontract, art 9, § 4). Thus, if SCE prevails on its wrongful termination claim, it will have a claim for damages under Section 9.4.
MBC cannot defeat SCE's right to pursue this recovery by relying on an alleged series of prior material breaches committed by SCE, including: (1) persistent violations of health and safety laws and regulations; (2) the Flood Incident; (3) failing to ensure the payment of prevailing wages; (4) failing to supply sufficient labor to adequately progress the subcontracted work; (5) failing to perform the work to MBC and OGS's satisfaction; and (6) failing to ensure that Oak maintained adequate insurance (see NYSCEF Doc No. 492 at 5-12). 
MBC did not contemporaneously respond to any of these prior alleged material breaches by serving SCE with a notice of default and opportunity to cure under Article 9. Rather, MBC [*6]continued to accept SCE's performance under the Subcontract and continued to render its own performance to SCE. On these facts, MBC's attempt to rely on prior alleged material breaches to defeat SCE's right of recovery is barred by the principle that "a party that has chosen to assert one of two inconsistent rights" may not "later seek[] to vindicate the alternative right" (Luitpold Pharm., Inc. v Ed. Geistlich Söhne A.G. Für Chemische Industrie, 784 F3d 78, 96 [2d Cir 2015]). 
"When a party materially breaches a contract, the nonbreaching party must choose between two remedies: it can elect to terminate the contract or continue it. If it chooses the latter course, it loses its right to terminate the contract because of the default" (Awards.com v Kinko's, Inc., 42 AD3d 178, 188 [1st Dept 2007], affd 14 NY3d 791 [2010]). A contracting party cannot "at the same time treat the contract as broken and as subsisting. One course of action excludes the other" (Strasbourger v Leerburger, 233 NY 55, 59 [1922]; see Inter-Power of NY v Niagara Mohawk Power Corp., 259 AD2d 932, 934 [3d Dept 1999], lv denied 93 NY2d 812 [1999]).
"But New York law does not treat as inconsistent the right to continue to perform and to accept performance under a contract (on the one hand) and the right to sue for damages based on a breach (on the other)" (Luitpold Pharm., 784 F3d at 97). "A party to an agreement who believes it has been breached may elect to continue to perform the agreement and give [timely] notice [of breach] to the other side rather than terminate it" (Capital Med. Sys. v Fuji Med. Sys., U.S.A., 239 AD2d 743, 746 [3d Dept 1997]). Where such an election is made, "the nonbreaching party does not waive the right to sue for the alleged breach" (Albany Med. Coll. v Lobel, 296 AD2d 701, 702 [3d Dept 2002]).
Having elected to treat the Subcontract as valid and subsisting when confronted with SCE's prior alleged material breaches,[FN11]
MBC may have preserved its right to sue for damages, but it may not now rely upon those prior alleged material breaches to excuse its own subsequent nonperformance (see Audthan LLC v Nick & Duke, LLC, 211 AD3d 419, 423 [1st Dept 2022] ["the tenant clearly elected, upon the earlier alleged breaches, to 'keep the contract in force, declare the defaults only . . . partial breaches, and recover the damages caused by those partial breaches'" (quoting 13 Richard A. Lord, Williston on Contracts § 39:32 [4th ed 2022]) (brackets omitted)]; Koch Entm't LP v Troma Entm't Inc., 2010 NY Misc LEXIS 4925, *7 [Sup Ct, NY County 2010]).
The branch of MBC's motion seeking dismissal of SCE's second cause of action therefore is denied in accordance with the foregoing.
C. Breach of Implied Covenant of Good Faith and Fair Dealing (3rd Cause of Action)
SCE alleges that MBC breached the implied covenant of good faith and fair dealing "by way of the unlawful and pretextual termination and the material breach(es) of contract" (SCE Complaint, ¶ 69). 
The factual allegations supporting this claim are essentially the same as those supporting SCE's claims for wrongful termination and breach of the Subcontract, and the claims seek essentially the same damages (compare id., ¶¶ 59-64, with id., ¶ 69). Accordingly, the claim for breach of the implied covenant is dismissed as redundant of SCE's first two causes of action (see [*7]Logan Advisors, LLC v Patriarch Partners, LLC, 63 AD3d 440, 443 [1st Dept 2009]).
D. Trust Fund Division (4th Cause of Action)
SCE alleges that MBC diverted trust funds received from OGS under its Prime Contract, in contravention of Article 3-A of the Lien Law (see SCE Complaint, ¶¶ 72-88). MBC moves for dismissal of the claim on the grounds that: (1) MBC expended more on the Project than it received from OGS, and (2) SCE failed to move for and obtain class certification.
In granting SCE leave to amend its complaint to amplify the allegations supporting this cause of action, the Court emphasized that a claim "for diversion of trust funds" must "be brought in the form of a class action on behalf of all trust beneficiaries" (NYSCEF Doc No. 207 ["First MTA Decision"] at 8; see Brooklyn Navy Yard Dev. Corp. v J.M. Dennis Constr. Corp., 12 AD3d 630, 632 [2d Dept 2004] ["an action to enforce a trust pursuant to Lien Law § 77 must be brought as a class action"], lv dismissed and denied 5 NY3d 748 [2005]). 
Inasmuch as SCE's time to move for and obtain class certification has long since passed (see CPLR 902), the fourth cause of action is dismissed.
E. Conversion (5th Cause of Action)
SCE alleges that it was wrongfully denied access to materials and equipment on the Project site following its termination (see SCE Complaint, ¶¶ 90-92). MBC moves for dismissal on the grounds that the claim is a mere restatement of SCE's claim for breach of the Subcontract.
"Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property" (Hart v City of Albany, 272 AD2d 668, 668 [3d Dept 2000] [internal quotation marks and citation omitted]). "[W]here possession of property is initially lawful, conversion occurs when there is a refusal to return the property upon demand" (Salatino v Salatino, 64 AD3d 923, 925 [3d Dept 2009], lv denied 13 NY3d 710 [2009]).
The Subcontract is a binding and enforceable agreement that governs MBC's right to "use" the "materials, implements, equipment, appliances or tools furnished by or belonging to [SCE] to complete [SCE's] work" (Subcontract, art 9, § 2 [c]). As such, the fifth cause of action is a mere restatement of SCE's claim for breach of contract under a conversion theory (see Sutton Park Dev. Corp. Trading Co. v Guerin & Guerin Agency, 297 AD2d 430, 432 [3d Dept 2002]; Peters Griffin Woodward, Inc. v WCSC, Inc., 88 AD2d 883, 884 [1st Dept 1983]).
F. Quasi-Contractual Claims (6th and 7th Causes of Action)
SCE seeks to recover in quasi-contract under theories of quantum meruit and unjust enrichment (see SCE Complaint, ¶¶ 93-103).
"Unjust enrichment occurs when in equity and good conscience, a party obtains or possesses value that rightfully belongs to another party" (Henning v Henning, 103 AD3d 778, 780-781 [2d Dept 2013] [internal quotation marks, brackets and citations omitted]). 
To state a cause of action for quantum meruit, "plaintiff must allege (1) the performance of services in good faith, (2) the acceptance of the services by [defendant], (3) an expectation of compensation therefor, and (4) the reasonable value of the services" (Fulbright & Jaworski, LLP v Carucci, 63 AD3d 487, 488-489 [1st Dept 2009]; see Hyman v Schwartz, 127 AD3d 1281, 1282 [3d Dept 2015]). 
There is no dispute that SCE's services to MBC were rendered pursuant to a valid and enforceable written agreement governing their relationship relative to the Project, including MBC's right to use SCE's materials and equipment in the event that SCE was terminated for cause (see Section 9.2 [c]). Accordingly, SCE's quasi-contractual claims must be dismissed (see [*8]Kulback's Inc. v Buffalo State Ventures, LLC, 197 AD3d 890, 892 [4th Dept 2021]; see also ARB Upstate Communications LLC v R.J. Reuter, L.L.C., 93 AD3d 929, 934 [3d Dept 2012]).
G. Payment Bond (8th Cause of Action)
SCE sues Travelers under State Finance Law ("SFL") § 137, seeking recovery under the Bond (see SCE Complaint, ¶¶ 105-106).
Given that neither side has established its entitlement to summary judgment as to SCE's claims for wrongful termination and breach of the Subcontract, Travelers has not demonstrated its entitlement to the dismissal of SCE's claim under the Bond.
H. Conclusion
SCE's first cause of action, alleging wrongful termination of the Subcontract, shall proceed to trial on the issue of whether SCE commenced and continued satisfactory correction of the default alleged in the Notice of Default with diligence and promptness.
If SCE prevails on this claim, it shall be entitled to pursue the damages authorized by section 4 of Article 9 under its second cause of action, alleging breach of the Subcontract (see Part II [B], supra). 
SCE shall also be entitled to seek the recovery of such damages from the Bond under its eighth cause of action. 
All of SCE's remaining causes of action against MBC and Travelers are dismissed.
III. MOTIONS DIRECTED AT MBC/TRAVELERS' ANSWER IN ACTION 1
A. Breach of Contract (1st MBC Counterclaim)
MBC alleges numerous breaches of the Subcontract by SCE, including: (1) persistent health and safety violations; (2) the Flood Incident; (3) failing to pay subcontractors; (4) failing to ensure that all employees, including those of lower-tier subcontractors, were paid prevailing wages; (5) failing to supply sufficient personnel to progress the work; (6) failing to perform the work to the "full satisfaction" of OGS and MBC; and (7) failing to ensure that Oak maintained adequate insurance (see SCE Answer, ¶¶ 108-119; see also NYSCEF Doc No. 492 at 5-12).
MBC moves for partial summary judgment on the counterclaim, arguing that "the undisputed evidence establishes that SCE committed multiple breaches of the Subcontract prior to [MBC]'s termination of SCE from the Project" (NYSCEF Doc No. 492 at 20). 
SCE's opposition does not challenge MBC's prima facie showing, but argues that "there is a genuine dispute of material fact as to whether [MBC] materially breached the Subcontract and whether SCE's defaults were only minor breaches" (NYSCEF Doc No. 555 at 6).
The first material breach alleged by SCE is MBC's failure to provide it "with a schedule for the Project as a whole, not just SCE or [MBC]'s scope of work" (id.). For the reasons stated in Part II (A) (3), supra, however, the Subcontract did not oblige MBC to provide SCE with a Baseline Schedule for the entire Project, and MBC's failure to supply SCE with a Baseline Schedule was not a breach of the SCE Subcontract.
Additionally, SCE was aware that it had not received a Baseline Schedule, but it did not declare MBC to be in material breach of the Subcontract or attempt to terminate the Subcontract on account of the claimed breach. Having elected to continue to perform under the Subcontract and accept MBC's performance thereunder, election-of-remedies principles foreclose SCE's belated attempt to treat the Subcontract as broken (see Part II [B], supra).
SCE further contends that MBC materially breached the Subcontract by systematically underpaying its payment applications (see NYSCEF Doc No. 555 at 7). MBC responds that the alleged underpayments merely were adjustments intended to reflect allowable costs under the [*9]relevant contracts, and SCE did not file a claim under Article 8 to dispute the adjustments (see Subcontract, art 8, § 2).
Even assuming that the alleged underpayments constituted breaches of the Subcontract, they were not material breaches. The modest underpayments claimed by SCE were not so substantial and fundamental that they defeated the object of the contracting parties (see Callanan v Keeseville, Ausable Chasm & Lake Champlain R.R. Co., 199 NY 268, 284 [1910]). And, in any event, SCE waived its right to challenge the adjustments by failing to give MBC timely notice of the disputes (see Subcontract, art 8, § 2).
Accordingly, SCE has failed to come forward with admissible evidence demonstrating a prior material breach of the Subcontract by MBC that would preclude it from maintaining a claim for affirmative relief under the Subcontract.
As to the particular breaches of the Subcontract alleged by MBC, SCE merely argues that "there is a genuine dispute of material fact as to . . . whether SCE's defaults were only minor breaches" (NYSCEF Doc No. 555 at 6). But even if the materiality of SCE's breaches genuinely were in dispute, that dispute would bear only on whether SCE may sue MBC for breach of the Subcontract (see Part II [B], supra). MBC is entitled to maintain a claim against SCE for the damages caused by SCE's breaches of the Subcontract regardless of whether the breaches are characterized as material or minor (see id.).
The Court therefore concludes that SCE has failed to raise a triable issue of fact or legal defense in opposition to MBC's prima facie demonstration that SCE breached the Subcontract through its persistent health and safety violations, the supervisory lapses that gave rise to the Flood Incident and its failure to supply a sufficient workforce to adequately progress the subcontracted work.[FN12]

B. Breach of Contract: Insurance (3rd MBC Counterclaim)
MBC moves for partial summary judgment on its counterclaim alleging that SCE breached its obligation to ensure that its "lower tier subcontractors shall purchase and maintain insurance" (Subcontract, art 6; see id., Ex. A; SCE Answer, ¶¶ 147-152). 
MBC submits proof that Oak's insurance policy contained a New York exclusion (see NYSCEF Doc No. 447 at 60), and Oak's principal admitted in his deposition that Oak did not have insurance coverage for its work on the Project (see NYSCEF Doc No. 438 at 44-45). 
SCE does not dispute any of the foregoing, but asserts that MBC insisted on the involvement of a minority-owned subcontractor, MBC did not object to Oak's insurance coverage during its performance of the work, and MBC has not identified any losses resulting from the alleged breach of the insurance obligation. 
The Court does not find SCE's arguments to be persuasive. The Subcontract obliged SCE to ensure that Oak maintained adequate insurance coverage, regardless of the reasons for Oak having been brought into the Project, and SCE has not identified any conduct on MBC's part amounting to material breach of the Subcontract or a waiver of the insurance obligation. 
Further, SCE's contention that MBC suffered no damage is not properly before the Court [*10]at this juncture. MBC moved for partial summary judgment as to liability only, and SCE did not cross-move for dismissal of the claim based upon the absence of damages.[FN13]
 However, it is apparent from SCE's opposition that Oak's lack of insurance was only a minor breach of the Subcontract, not a material breach (see n 11, supra).
C. Breach of Contract: Failing to Pay Oak (6th MBC Counterclaim)
MBC alleges that SCE breached the Subcontract by failing to pay Oak for the labor, equipment and materials it furnished to the Project, which led Oak to serve a notice of lien upon MBC in the sum of $661,711.20 (see NYSCEF Doc No. 554, ¶ 146) and commence Action No. 2 to recover the outstanding contract balance (see id., ¶ 147).
In opposition, SCE generally argues that MBC "is not entitled to summary judgment because it failed to follow the default and notice to cure procedure required under Article 9 of the Subcontract, it was already in material breach before SCE's alleged breaches occurred, and the alleged breaches do not constitute material breaches of the contract" (NYSCEF Doc No. 555 at 18). These contentions lack merit for essentially the reasons stated in Parts II (B) and III (A), supra.
SCE's only argument in opposition specifically directed at this counterclaim is that "SCE had paid all of its subcontractors and suppliers in full on all approved payment applications," and "Oak [and others] were unpaid amounts that were subject to payments [that MBC] was withholding from SCE when it was terminated. To the extent that these subcontractors were unpaid, [MBC] procured this default by failing to timely pay SCE and by persistently underpaying SCE" (id. at 11-12).
Under the Subcontract, SCE was obliged to use MBC's payments "to pay its Project workers, lower tier subcontractors, material, and equipment suppliers" (Subcontract, art 7, § 7), and MBC appears to allege a violation of this provision (see SCE Answer, ¶ 178). However, MBC has not supported its motion with admissible proof of a trust violation.
Nonetheless, as MBC observes, the Subcontract also makes it an event of default if SCE "fails to make prompt payment to its . . . sub-contractors . . . or fails to discharge liens filed by them" (Subcontract, art 9, § 1 [d]). The undisputed proof shows that SCE failed to promptly pay Oak and discharge Oak's claimed lien. Accordingly, MBC is entitled to partial summary judgment on its sixth cause of action.
D. Breach of Contract: Prevailing Wage (4th MBC Counterclaim)
MBC alleges that SCE breached the Subcontract by failing to pay prevailing wages (see SCE Answer, ¶¶ 155-157). The counterclaim also alleges that Sunn failed to pay supplemental fringe benefits required by the prevailing wage law (see id., ¶ 158).
SCE "agree[d] to indemnify, defend and hold harmless [MBC] from any and all damages, losses or expenses arising from or relating to claims that [SCE], or any lower tier subcontractor performing any portion of the Work under this Subcontract, violated the prevailing wage law" (Subcontract, art 5, § 8).
MBC submits proof that it paid $110,584.56 to a union benefit fund on behalf of SCE, Oak and Sunn due to the nonpayment of supplemental fringe benefits to Sunn's workers, as required by the prevailing wage law, and SCE has not raised a triable issue of fact in opposition [*11](see NYSCEF Doc No. 554, ¶¶ 141-143). 
Accordingly, MBC is entitled to judgment in the amount of $110,584.56 on its fourth counterclaim.
E. Negligence (9th MBC Counterclaim)
MBC alleges that SCE negligently performed the asbestos abatement and demolition work required under the Subcontract (see SCE Answer, ¶¶ 198-209). SCE moves for dismissal on the ground that the claim is redundant of MBC's counterclaims for breach of the Subcontract. MBC responds that its negligence counterclaim is based upon an independent legal duty.
"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. . . . This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract" (Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 389 [1987]). "[M]erely alleging that the breach of a contract duty arose from a lack of due care will not transform a simple breach of contract into a tort" (Sommer v Federal Signal Corp., 79 NY2d 540, 551 [1992]). 
"A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties" (id. at 551-552 [citation omitted]). In assessing such a claim, courts look to "the nature of the injury, the manner in which the injury occurred and the resulting harm" (Verizon NY, Inc. v Optical Communications Group, Inc., 91 AD3d 176, 181 [1st Dept 2011] [internal quotation marks and citation omitted]). An independent legal duty also may arise where the defendants' conduct implicates "the personal safety of citizens" (New York Univ. v Continental Ins. Co., 87 NY2d 308, 317 [1995]; see Sommer, 79 NY2d at 553).
This is not a proper case to impose legal duties independent of the parties' Subcontract, an agreement between commercial contractors for asbestos abatement and the handling of hazardous materials (see Subcontract, art 1, § 1). MBC's claims seek the recovery of purely economic losses associated with remediating the Flood Incident (see SCE Answer, ¶ 208); SCE's failure to secure and/or inspect the water line did not implicate any special risks associated with the abatement of hazardous materials (see id., ¶ 205); and SCE's failure to secure the water line, and the resulting discharge of contaminated water in a commercial structure under substantial reconstruction did not endanger the personal safety of New Yorkers to an appreciable degree. The facts of this case are not remotely comparable to the fire alarm protection services at issue in Sommer. 
Accordingly, MBC's ninth counterclaim is dismissed as redundant of its counterclaim for breach of the Subcontract.[FN14]

F. Contractual Indemnification
MBC's second counterclaim seeks contractual indemnification from SCE "against the losses and prospective losses it will sustain as a result of SCE's delays, failure to properly perform its work, SCE's flood, its discharge of asbestos, the additional costs arising out of SCE [*12]being found non-responsible by OGS, the additional costs of MBC's termination by OGS (including all damages resulting from the surety takeover for which MBC is liable to Travelers), and the additional cost to MBC of engaging replacement subcontractor(s) to correct and complete SCE's work," as well costs associated with SCE's "failure to clean and remove its equipment from the Project site" (SCE Answer, ¶ 142; see also id., ¶¶ 143-144).
MBC and Travelers' first joint counterclaim also is for contractual indemnity, seeking indemnification of any damages awarded to OGS in the Court of Claims Case: "To the extent MBC and Travelers are found to be liable to OGS for the counterclaims alleged in [that case], SCE is contractually required to indemnify and defend MBC and Travelers against all of the claims and damages therein, including but not limited to all costs incurred by MBC and/or MBC's surety and passed through to MBC with respect to the Project" (id., ¶¶ 227-234).
Article 5 of the Subcontract, entitled "Indemnification," imposes five different indemnity obligations upon SCE, four of which are not directly implicated by the challenged counterclaims: (1) indemnity for intellectual property claims;[FN15]
(2) indemnity for unsafe working conditions;[FN16]
(3) indemnity for violations of Labor Law §§ 240, 241;[FN17]
and (4) indemnity for prevailing wage claims.[FN18]
At issue is section 4 of Article 5 ("Section 5.4"), which reads, in pertinent part:
To the fullest extent permitted by law, [SCE] shall defend, indemnify and hold harmless [OGS], Architect and [MBC] . . . from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of [SCE's] Work under this Subcontract, provided that any such claim, damage, loss or expense (1) is attributable to . . . injury or to destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission of [SCE], anyone directly or indirectly employed by it or anyone for whom [SCE] may be liable.
In addition, Article 3 of the Subcontract, captioned "Schedule of [SCE's] Work," imposes an additional indemnity obligation upon SCE:
Should [SCE] fail to . . . continue and complete the Work within the time allowed under [the Subcontract] and any time extensions granted to it, [SCE] shall defend, indemnify [*13]and save harmless [OGS], Architect, [MBC] and other Subcontractors from any claims, loss or damages arising from or caused by [SCE's] delay (Subcontract, art 3, § 5 ["Section 3.5"]).
In moving for dismissal of the counterclaims for contractual indemnification, SCE argues: (i) the losses claimed by MBC do not fall within Section 5.4; (ii) neither Section 5.4 nor Section 3.5 evinces a clear intent of requiring indemnification for first-party (intra-party) losses; and (iii) Travelers is subrogated to the rights of MBC and may not make any claims beyond those maintainable by MBC.
1. Scope of Indemnity Under Section 5.4
SCE contends that "[t]he plain language of the Subcontract precludes [MBC] and Travelers' claims that SCE must indemnify them for losses sustained due to alleged improper performance of the work, water leaks, discharges of asbestos, costs arising from non-responsibility hearings, terminations costs, costs to retain replacement subcontractors, and costs to complete the project" (NYSCEF Doc No. 431 at 19). "None of the alleged damages suffered by [MBC] or Travelers falls within the scope of [Section 5.4]" (id.).
MBC responds that SCE's arguments are foreclosed by the Court's decision granting MBC and Travelers leave to amend their answers to allege the contractual indemnity claims (see NYSCEF Doc No. 494 at 16; see also NYSCEF Doc No. 266 ["Second MTA Decision"]). In particular, MBC and Travelers rely on the language describing their proposed amendments as "facially meritorious" (Second MTA Decision at 8).
As clearly stated in the Second MTA Decision, however, "a motion to amend is not a proper vehicle for the determination of the merits, and a court shall not examine the legal sufficiency or merits of a pleading unless the insufficiency or lack of merit is clear and free from doubt" (id. at 9 [internal quotation marks and citations omitted]). Thus, the Second MTA Decision merely establishes that SCE had not shown the proposed contractual indemnity claims to be so patently lacking in merit as to warrant the denial of leave to amend. Accordingly, MBC and Travelers' invocation of the law of the case doctrine is wholly without merit (see Madison 96th Assoc., LLC v 17 E. 96th Owners Corp., 120 AD3d 409, 410 [1st Dept 2014]).
That said, it was SCE's initial burden on summary judgment to affirmatively demonstrate, through admissible evidence, that none of the losses or expenses for which MBC seeks indemnity under Section 5.4, including the losses and expenses arising from the water leaks, discharge of asbestos or SCE's failure to clean the equipment (see SCE Answer, ¶ 142), are "not attributable to . . . injury to or destruction of tangible property (other than the Work itself)." In light of SCE's failure to discharge its initial burden, MBC was under no obligation to come forward with evidence establishing losses or expenses falling within the scope of Section 5.4 (see Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).[FN19]

2. Intra-Party Indemnity
SCE argues that neither Section 5.4 nor Section 3.5 of the Subcontract were intended to provide MBC with a right of indemnity for its own first-party (or intra-party) losses. 
"[T]he scope of [SCE's] obligation is governed by the parties' intent as revealed by the [*14]plain language of the indemnification provision that they agreed upon" (WSA Group, PE-PC v DKI Eng'g & Consulting USA PC, 178 AD3d 1320, 1323 [3d Dept 2019]). 
"When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed. The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances" (Hooper Assoc. v AGS Computers, 74 NY2d 487, 491-492 [1989] [citations omitted]; see Sage Sys., Inc. v Liss, 39 NY3d 27, 32 [2022] [reaffirming Hooper]).
Embracing the strict construction of indemnification clauses commanded by the Court of Appeals in Hooper and reaffirmed in Sage, the federal courts in the Second Circuit have adopted a "default presumption . . . that indemnification involves liabilities, losses, or claims associated with third-party suits, rather than contractual damages or losses between the contracting parties themselves" (BNP Paribas Mtge. Corp. v Bank of Am., N.A., 778 F Supp 2d 375, 416 [SD NY 2011]). "[A]bsent 'unmistakably clear' language in an indemnification provision that demonstrates that the parties intended the clause to cover first-party claims, an agreement between two parties 'to indemnify' each other does not mean that one party's failure to perform gives rise to a claim for indemnification" (Lehman XS Trust, Series 2006-GP2 v GreenPoint Mortg. Funding, Inc., 916 F3d 116, 125 [2d Cir 2019] [citation omitted]).
"Notwithstanding the strict construction rule enunciated [by the Court of Appeals] in Hooper," and the Second Circuit's faithful application of that rule, the Appellate Divisions "routinely" hold that, "where the indemnification [language] is broad, in the absence of limiting language, both intra-party and third party claims are covered" (Matter of Part 60 RMBS Put-Back Litig., 195 AD3d 40, 56 [1st Dept 2022]; see WSA Group, 178 AD3d at 1323-1324 ["Nothing in the (indemnity) provision's broad language . . . reveals that the parties intended to exclude claims such as this from its coverage or to limit its scope to breaches of duty to third parties" (emphasis added)]; HealthNow NY, Inc. v David Home Bldrs., Inc., 176 AD3d 1602, 1605 [4th Dept 2019]; Crossroads ABL LLC v Canaras Capital Mgt., LLC, 105 AD3d 645, 646 [1st Dept 2013]).
Although this line of binding Appellate Division precedent supports MBC and Travelers' application of Section 5.4 to intra-party claims, it is apparent from the text and structure of Article 3 of the Subcontract that the parties did not intend to allow intra-party indemnification under Section 3.5 for "claims, loss or damages arising from or caused by [SCE's] delay." 
Section three of Article 3 ("Section 3.3") governs MBC's right to recover delay damages from SCE. "[I]n view of the difficulty of estimating [MBC's delay] damages with exactness," the MBC and SCE agreed on an "expressed, fixed, computed, determined and agreed upon" measure of "the damages which will be suffered by [MBC] by reason of [SCE's] default" (id.). In the event that SCE failed to timely complete its work, SCE "shall pay to [MBC], as and for liquidated damages, and not as penalty, the sum of zero dollars ($0.00) per day . . . as the damages which will be suffered by [MBC] by reason of such default" (id.).
Notwithstanding these agreements and acknowledgements, MBC and Travelers now contend that they are entitled to pursue an unliquidated damages-for-delay remedy under the guise of intra-party indemnification. The Court rejects this construction of the Subcontract, concluding that it would render meaningless the express provisions of Section 3.3 (cf. Shah v 20 E. 64th St., LLC, 198 AD3d 23, 43 [1st Dept 2021] [allowing intra-party indemnity where "no other provision in the . . . agreement would be rendered meaningless"]; Crossroads, 105 AD3d [*15]at 645-646).[FN20]
Under the circumstances, the language of Section 3.5 does not "clearly imply" an intent to grant MBC a delay-damages remedy against SCE under the rubric of indemnity and, in fact, evinces a contrary intention.
3. Conclusion
MBC's second counterclaim and MBC and Travelers' first joint counterclaim are dismissed to the extent that they seek intra-party indemnification under Section 3.5 for claims, losses or damages caused by SCE's delay. SCE's motion is otherwise denied.
G. Common-Law Indemnity
Common-law indemnity is the subject of MBC's eighth counterclaim (see SCE Answer, ¶¶ 193-196), and MBC and Travelers' second joint counterclaim (see id., ¶¶ 236-239). 
MBC alleges that all of its losses, liabilities, costs and damages are attributable to SCE's wrongful conduct, to which "MBC did not cause or contribute" (id., ¶¶ 193-194). MBC and Travelers similarly allege that all of the losses, liabilities, costs and damages sought by OGS in the Court of Claims Case were caused solely by SCE (see id., ¶¶ 236-237).
SCE moves for dismissal of the counterclaims on the ground that common-law indemnity is not available as an intra-party remedy for breaches of contract, and MBC necessarily bears at least partial responsibility for any proven breaches of its Prime Contract with OGS.
The Court of Appeals has described common-law or implied indemnity as follows:
Implied indemnity is a restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other. Generally, it is available in favor of one who is held responsible solely by operation of law because of [its] relation to the actual wrongdoer, but authorities have noted that the principle is not . . . limited to those who are personally free from fault. . . . The purpose of all contribution and indemnity rules is the equitable distribution of the loss occasioned by multiple defendants. In furtherance of that purpose the courts have granted relief in a variety of cases in favor of the party who, in fairness, ought not bear the loss, allowing it to recover from the party actually at fault. They have found indemnity appropriate because of a separate duty owed the indemnitee by the indemnitor (thus the indemnitee may recover for the wrong to it), because there is a great difference in the gravity of the fault of the two tort-feasors, or because the duties owed to the injured plaintiffs and causing injury are disproportionate (Mas v Two Bridges Assoc., 75 NY2d 680, 690-691 [1990] [internal quotation marks and citations omitted]).
"It is a familiar principle that a cause of action for common-law indemnification must be based upon a defendant's breach of duty to a third party" (WSA Group, 178 AD3d at 1323 [*16][citations omitted]). Here, MBC's eighth counterclaim is predicated solely on intra-party duties. To that extent, the counterclaim fails as a matter of law.
Insofar as MBC and Travelers seek implied indemnity for losses or damages arising from the Court of Claims Case, the Court concludes that such losses necessarily would involve some culpability on the part of MBC. "[A] party cannot obtain common-law indemnification resulting from its own breach of contract" (Benjamin Office Supply & Servs. v 2 Crystals Inc., 2021 WL 4813229, *11, 2021 US Dist LEXIS 150425, *29-30 [ED NY Aug. 10, 2021, No. 20-CV-3693 (JS/ST)] [internal quotation marks and citation omitted] [collecting authorities]; see Facilities Dev. Corp. v Miletta, 180 AD2d 97, 104 [3d Dept 1992]; cf. 17 Vista Fee Assoc. v Teachers Ins. & Annuity Assn. of Am., 259 AD2d 75, 80 [1st Dept 1999] ["to be entitled to indemnification, the owner or contractor seeking indemnity must have delegated exclusive responsibility for the duties giving rise to the loss to the party from whom indemnification is sought"]). 
Contrary to the argument of MBC and Travelers, MBC's Subcontract with SCE was not an exclusive delegation of the duties imposed upon MBC under its Prime Contract with OGS. In particular, MBC was obliged to supervise, control and coordinate the work of its subcontractors (see Prime Contract, art 6), and OGS cited MBC's failure to "properly manage [its] Subcontractors" as a basis for terminating the Prime Contract (NYSCEF Doc No. 405).
Accordingly, MBC and Travelers' counterclaims for common-law indemnity are dismissed.
H. Travelers' Counterclaims
Travelers alleges two counterclaims in its own right: the first for "excess completion costs for which it is not fully indemnified/reimbursed by MBC and/or from other source" (SCE Answer, ¶¶ 211-217), and the second for costs associated with cleaning the equipment of SCE's lower-tier subcontractors (see id., ¶¶ 219-225).
SCE moves to dismiss the counterclaims as redundant of MBC's counterclaims for breach of contract. SCE further argues that the claims are based on the "demonstrably false" theory that "SCE was responsible for [MBC]'s termination" (NYSCEF Doc No. 431 at 16). 
A completing surety has the right to pursue claims against the principal's subcontractor that caused the surety to incur losses (see Menorah Nursing Home v Zukov, 153 AD2d 13, 17 [2d Dept 1989]; see also Brownell Steel, Inc. v Great Am. Ins. Co., 28 AD3d 842, 843 [3d Dept 2006]), and "there is nothing in law that prevents a surety from prosecuting claims identical to is principal, so long as each is suing for distinct damages and there is no potential for double recovery" (First MTA Decision at 12). Accordingly, the Court declines to dismiss Travelers' counterclaims as duplicative of those alleged by MBC.
Nonetheless, the present record does not allow the Court to determine as a matter of law the role, if any, that SCE's breaches of the Subcontract played in OGS's decision to terminate MBC's Prime Contract, and, in any event, OGS's termination of the Prime Contract is the subject of the pending Court of Claims Case (see Part VI [A] [3], [C] [1], infra).
Accordingly, SCE's motion to dismiss Travelers' counterclaims and Travelers' motion for partial summary judgment on its first counterclaim are denied.
IV. MOTIONS DIRECTED AT OAK'S COMPLAINT
MBC and Travelers move in Action No. 2 for the dismissal of the claims alleged against [*17]them by Oak.[FN21]

A. Quasi-Contractual Claims (4th and 5th Causes of Action)
Oak seeks recovery in quasi-contract under theories sounding in quantum meruit and unjust enrichment (see Oak Complaint, ¶¶ 45-55). MBC moves for dismissal of the claims on the grounds that: (i) Oak was not in privity with MBC; (ii) MBC did not agree to assume SCE's obligations to Oak; (iii) Oak had no reasonable expectation of direct compensation from MBC; and (iv) MBC was not unjustly enriched by Oak's work.
A claim for quantum meruit requires allegations of "(1) the performance of services in good faith, (2) the acceptance of the services by [defendant], (3) an expectation of compensation therefor, and (4) the reasonable value of the services" (Fulbright & Jaworski, 63 AD3d at 488-489). 
"Unjust enrichment occurs when in equity and good conscience, a party obtains or possesses value that rightfully belongs to another party" (Henning, 103 AD3d at 780-781 [internal quotation marks, brackets and citations omitted]). 
It has long been the "general rule" in New York "that a secondary subcontractor [Oak] who is not paid by its primary subcontractor [SCE] cannot look for payment to the contractor with whom the primary subcontractor contracted [MBC], absent privity of contract, . . . or an agreement by the contractor, express or implied, to pay its subcontractor's obligations" (Sky-Lift Corp. v Flour City Architectural Metals, 298 AD2d 214, 214-215 [1st Dept 2002]; see IMS Engrs.-Architects, P.C. v State of New York, 51 AD3d 1355, 1358 [3d Dept 2008], lv denied 11 NY3d 706 [2008]; Metropolitan Elec. Mfg. Co. v Herbert Constr. Co., 183 AD2d 758, 759 [2d Dept 1992]; see also EFCO Corp. v U.W. Marx, Inc., 124 F3d 394, 401 [2d Cir 1997]).
Oak acknowledges that its work on the Project was not performed pursuant to a contract with MBC and that it is not in contractual privity with MBC (see NYSCEF Doc No. 133, ¶¶ 12-13).[FN22]
Oak further acknowledges that MBC "never agreed to pay Oak directly" (id., ¶ 52), and Oak makes no claim that MBC assumed SCE's obligation to do so (see id., ¶ 53).[FN23]
Oak does claim to have "relied on the fact that OGS required [MBC] to post performance and payment bonds" to "protect[] second-tier subcontractors who had no written agreement with the general contractor" (NYSCEF Doc No. 135 ["Eichen Aff."], ¶ 20),[FN24]
but these protections are available to Oak without resort to quasi-contractual theories of recovery (see Part IV [C], infra).
The Court therefore concludes that Oak's quasi-contractual claims must be dismissed insofar as they are directed at recovering the unpaid balance under the Oak Subcontract.
That leaves Oak's contention that MBC "entered [into] an implied agreement to pay for the use of Oak's equipment" (NYSCEF Doc No. 133, ¶ 52). It appears that Oak is referring to a contract implied in law, as Oak provides no evidentiary support for an implied-in-fact contract, [*18]which is one that "arise[s] from a mutual agreement and an 'intent to promise, when the agreement and promise have simply not been expressed in words'" (Maas v Cornell Univ., 94 NY2d 87, 93 [1999], quoting 1 Williston, Contracts § 1:5 at 20 [4th ed 1990]).
But a quasi-contractual claim "only applies in the absence of an express agreement, and it is not really a contract at all, but rather a legal obligation imposed to prevent a party's unjust enrichment" (Clark-Fitzpatrick, 70 NY2d at 388). "[A] quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved. The law creates it, regardless of the intention of the parties, to assure a just and equitable result" (id. at 388-389 [quotation marks and citation omitted]).
Here, MBC's right to use Oak's equipment is the subject of express contractual agreements. Under its Subcontract with SCE, MBC had the right to "use" the "materials, implements, equipment, appliances or tools furnished by or belonging to [SCE] to complete [SCE's] work" following a termination of SCE for cause (Subcontract, art 9, § 2 [c]). And in executing the Oak Subcontract, Oak acknowledged that it had reviewed the Subcontract, found its terms to be "acceptable," and agreed to be bound to SCE for such obligations, which were deemed incorporated into the Oak Subcontract (see Oak Subcontract, § 2; NYSCEF Doc No. 133, ¶¶ 10-11).
Oak acknowledges that the parties' agreements gave MBC the right to use its equipment to complete SCE's work, but it argues that "nothing therein grants [MBC] the right to use the equipment free of charge" (Eichen Aff., ¶ 18). The problem for Oak, however, is that nothing in the agreements granted Oak a right to be compensated for the use of its equipment.
The Oak Subcontract is an integrated agreement (see Oak Subcontract, § 23) that authorized MBC to use Oak's equipment to complete SCE's scope of work without establishing any countervailing right on the part of Oak to be compensated for such use. Accordingly, Oak's claim of an implied compensation agreement runs afoul of the principle that a valid and enforceable written contract governing a particular subject matter "precludes recovery in quasi contract for events arising out of the same subject matter" (Clark-Fitzpatrick, 70 NY2d at 388). The use of equipment and the right to be compensated for such use plainly arise from the same subject matter and would naturally be expected to be addressed together in the same instrument. Accordingly, Oak's quasi-contractual claims against MBC are dismissed.
B. Wrongful Detention (7th Cause of Action)
Oak alleges that it was denied access to equipment left at the Project site following its termination, and it seeks to recover the fair rental value of the equipment "unlawfully" detained by MBC under a tort theory (Oak Complaint, ¶¶ 60-63). 
MBC moves for dismissal of the claim on the ground that Oak's complaint fails to allege the essential elements of a cause of action for wrongful detention, including identification of the equipment owned by Oak that was wrongfully detained, a demand by Oak for the return of such equipment, and a refusal by MBC. Further, MBC complains that Oak did not produce any documents during discovery identifying the equipment for which it seeks compensation or proving its ownership (see NYSCEF Doc No. 133, ¶¶ 40-50).
Oak's opposition to the motion provides little clarity as to these issues. Oak submits a list of equipment for which it seeks the fair rental value (see NYSCEF Doc No. 138), but Oak's principal admits that some of this equipment was purchased by Sunn (see Eichen Aff., ¶ 16).
To succeed on a cause of action for "wrongful detention, it is for the plaintiff to plead and prove facts showing that the detention is wrongful" (Hofferman v Simmons, 290 NY 449, [*19]456 [1943]). Thus, Oak is "bound to show title in [itself], and [MBC] could defend itself by showing that [Oak] did not have title" (id. [internal quotation marks and citation omitted]; see also Matter of Peters v Sotheby's Inc., 34 AD3d 29, 33 [1st Dept 2006] [cause of action for unlawful detention of chattel "sounds in replevin"], lv denied 8 NY3d 809 [2007]).[FN25]

Through its moving papers, MBC has demonstrated that Oak's complaint fails to adequately allege the essential elements of a cause of action of wrongful detention. MBC has further demonstrated that Oak did not produce documents during discovery filling in these gaps by identifying the specific items of equipment for which Oak seeks recovery and proving its ownership of the equipment. Accordingly, the burden shifts to Oak to lay bare its proof and come forward with admissible evidence showing that it possesses a viable cause of action for wrongful detention.
Oak has failed to discharge this burden. Oak submits an equipment rental invoice sent to MBC in January 2019, seeking $1.6 million in rental payments (see NYCEF Doc No. 138). However, Oak admits that Sunn purchased some of this equipment (see Eichen Aff., ¶ 16), and Oak has supplied no documentation showing that it purchased or owns any of the equipment.
More fundamentally, Oak's claim for wrongful detention is conclusively defeated by the terms of the parties' agreements. Oak recognizes, as it must, that MBC was entitled to use its equipment to complete SCE's scope of work (see id., ¶ 18). As such, there was nothing "wrongful" or "unlawful[]" about the detention. And while "retention and use of the equipment was clearly a benefit" to MBC (id., ¶ 19), it was a benefit obtained through bargained-for exchanges to which Oak was a party that made no provision for Oak to be paid the fair rental value (or any other compensation) for MBC's retention and use of the equipment.
Oak further complains that its equipment was returned in poor condition (see id.), but it sues only for wrongful detention. There is no claim for trespass to chattels, a cause of action implicated where a party causes "harm to the condition, quality or material value of the chattels at issue" ("J. Doe No. 1" v CBS Broadcasting Inc., 24 AD3d 215, 215 [1st Dept 2005]; see generally Sporn v MCA Records, 58 NY2d 482, 487 [1983]).
Based on the foregoing, Oak's claim for wrongful detention is dismissed.
C. Payment Bond (6th Cause of Action)
Finally, Oak sues under SFL § 137 to be compensated for the labor and materials it supplied to the Project under the Oak Subcontract (see Oak Complaint, ¶¶ 57-59).
"[SFL] § 137 requires the general contractor on a public improvement project to secure a labor and materials bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor on the project, and entitles every person who has furnished labor or material on a public works project to sue for payment on the bond" (Clayton B. Obersheimer, Inc. v Travelers Cas. & Sur. Co. of Am., 96 AD3d 1284, 1285 [3d Dept 2012] [internal quotation marks, brackets and citations omitted]). "Generally, the surety is required to make all payments due to a claimant, its liability limited by the conditions of the bond and relevant subcontract" (id. [citations omitted]).
MBC and Travelers do not challenge Oak's right to proceed against the Bond for [*20]payment, but they do contend that "Oak simply cannot prove that it is entitled to any recovery as against [MBC] and, therefore, as against Travelers" (NYSCEF Doc No. 111 at 12-13; see Riverside Iron Works v Insurance Co. of N. Am., 156 AD2d 919, 921 [3d Dept 1989] ["surety's liability is to be measured by that of the principal"]). 
For the reasons stated Part IV (A) and (B), supra, the Court agrees with MBC and Travelers that Oak has no claim against the Bond for the rental value of its equipment.
Regarding labor, MBC argues that the labor for which Oak seeks compensation "was not provided by Oak, but another entity, Sunn. Oak cannot confirm the hours that Sunn's employees worked and/or the amount invoiced by Sunn. This evidence is necessary for Oak to prove its case as against Travelers, but this evidence does not exist. As to Oak's alleged actual losses, it would not incur a loss for funds that it owes to Sunn if it never has to pay Sunn, an entity that Oak does not even know whether it continues to exist" (NYSCEF Doc No. 111 at 13 [citations omitted]).
Oak admits that Sunn provided all on-site labor (see NYSCEF Doc No. 121 at 14), but Oak claims that it performed certain off-site work, including providing means and methods, reviewing reports, inventorying equipment, and serving as a liaison with SCE, MBC and OGS (see Eichen Aff., ¶ 10). Oak also "made frequent visits to the site in connection with said activities" (id.). 
Oak's principal acknowledges that Oak no longer is in communication with Sunn (see NYSCEF Doc No. 133, ¶¶ 17-18), and Oak was unable to review records of the hours worked by Sunn employees (see id., ¶ 21). Oak asserts, however, that it had a fixed-price contract with Sunn "based upon a percentage of completion," thus rendering irrelevant the number of hours worked by Sunn's employees (Eichen Aff., ¶ 9).
The Court concludes that Travelers has failed to demonstrate its entitlement to dismissal of the labor component of Oak's claim under the Bond. "The unpaid pay applications and retainage totaling $283,664.70, are based on the percentage of completed work and include services rendered by Oak together with overhead, profit, and sums paid or to be paid to Sunn for the work which Sunn provided" (id., ¶ 13; see NYSCEF Doc No. 137 [pay applications]; NYSCEF Doc No. 139 [bond claim], §§ 2.3, 2.4).[FN26]

Travelers insists that evidence of "the hours that Sunn's employees worked and/or the amount invoiced by Sunn . . . is necessary for Oak to prove its case as against Travelers" (NYSCEF Doc No. 111 at 12-13), but it has not adequately articulated the source of that alleged obligation under the Oak Subcontract, which establishes a total value of $1,926,851 for Oak's work. To be sure, such a requirement may well appear somewhere in the (voluminous) collection of contract documents, but Travelers has failed to substantiate its contention that Sunn's labor records are necessary for Oak to recover the benefit of its bargain with SCE under the Bond.
As for change orders, Travelers observes that Oak's "sworn Proof of Claim . . . claimed that there were approved change orders in the amount of $122,000 but in the responses to the Request for Production served on Oak, it responded as to change orders 'none'" (NYSCEF Doc No. 133, ¶ 58). Oak admits giving the foregoing discovery response, but contends that the response was incorrect at the time it was given, and its bond claim, which was submitted shortly [*21]after SCE and Oak were terminated and which has remained in Travelers' hands ever since, represents the correct amount of the change orders (see id.; Eichen Aff., ¶ 23; NYSCEF Doc No. 139). The Court concludes that resolution of this dispute must await trial.
Accordingly, Oak's claim under the Bond is dismissed to the limited extent that it seeks to recover for equipment rental.
V. MOTIONS DIRECTED AT CLASSIC'S COMPLAINT
MBC, Travelers, Patrick T. Murnane and James R. Hogel move for the dismissal of Classic's claims in Action No. 3 (see NYSCEF Doc No. 177 ["Classic Complaint"]).[FN27]

A. Breach of Classic Subcontract (1st Cause of Action)
Classic alleges that MBC breached the Subcontract by failing to pay an outstanding balance of $1,292,369 (see id., ¶ 12).[FN28]
MBC contends that Classic's own prior material breaches of the Subcontract preclude it from maintaining the claim for breach.
MBC relies primarily on Classic's role in causing the October 24, 2017 Lead Incident. MBC submits proof that Classic's use of a high-pressure (or jet) washer to perform a final cleaning on the third floor of the Building stripped lead-based paint from metal beams (see NYSCEF Doc No. 192 ["Hogel Aff."], ¶ 16). Together with Classic's failure to properly manage the runoff, lead-contaminated water was dispersed throughout the Building and into storm sewers (see id., ¶ 17).
Classic had been on the Project for only about six weeks at the time of the Lead Incident. And during those six weeks, Classic and MBC had been cited on two separate instances for Classic's misuse of a pressure washer.
First, on October 3, 2017, Classic and MBC were cited for Classic's use of a "pressure washer on the 2nd floor during gross removal of spray on fireproofing," which was "a direct violation of code rule" (NYSCEF Doc No. 197). "Classic was notified, operation was discontinued[,] a review of code rule was completed, a verbal warning was issued next offense supervisor will be removed from task at hand and removal from project site is possible" (id.).
Just ten days later, on October 13, 2017, Classic was cited again for inappropriately using a pressure washer to remove spray-on fireproofing (see NYSCEF Doc No. 198). OGS's citation stated that Classic's conduct was contrary to "NYS Code Rule and is in violation of written and verbal directive[s] from OGS" (id.).
Following the Lead Incident, OGS removed a host of Classic workers "from further work on [the Project]" (NYSCEF Doc No. 200) and issued a Notice of Deficiency to MBC and Classic (see NYSCEF Doc No. 201). OGS's Notice recited that "orange tinted water" was "coming from the hoses used by Classic" on the third floor (id.). The Notice also memorialized Classic's insistence that it was "using the correct filtering system" for the runoff, an assertion that OGS found puzzling because Classic "did not have the required SPDES permit" from the Department of Environmental Conservation ("DEC") to discharge the runoff into State waters (id.).
After test results showed that there was "lead contaminated water throughout the third floor" (NYSCEF Doc No. 202), OGS directed MBC to "cease asbestos operations . . . to prevent [*22]further spreading of [the] potential lead contamination" throughout the Building (id.).
OGS wrote to MBC on November 2, 2017, advising of "alarming" test results showing that Classic and MBC's "efforts to prevent further spread of [lead] contamination failed" (NYSCEF Doc No. 205 [emphasis in original]). OGS had "serious concerns that the contamination has and will continue to spread" (id.), and it directed MBC to retain a consultant to develop a comprehensive remediation plan (see id.).
OGS wrote again on November 7, 2017. In a strongly-worded letter, OGS insisted that Classic "does not fully understand they are responsible for this problem that was completely avoidable" (NYSCEF Doc No. 206 at 1). "[T]he orange water discharge issue was a direct result of improper procedures that were shut down earlier in the day, and the discharge of the materials into the storm drain system without the required [DEC] permit . . . is not permissible" (id.). While also taking issue with MBC's supervisory lapses and its failure to "proactively address the improper removal issue," OGS's letter emphasized the "willful" nature of Classic's "discharge of wastewater . . . in the storm drainage system without any permits" (id. at 3-4).
OGS terminated the Prime Contract on November 13, 2017. In addition to citing MBC's delays and its failure to present a "workable" recovery plan (NYSCEF Doc No. 207 at 1), the termination letter also relied on the Lead Incident and MBC's supervisory failures relative thereto:
[MBC] has also failed to ensure timely and competent completion of the abatement work and to prevent ongoing deficiencies and violations. As an example, on the day following the meeting on October 23, 2017, Classic was found to be improperly pressure-washing beams on the third floor and allowing known lead contaminated orange paint to wash off, and following inadequate and unapproved filtering procedures, they allowed the contaminated water to enter outside storm drains. Both the Department of Labor and [DEC] have become involved in this matter upon OGS's notification. Test samples showed very high levels of lead many areas of the building, and as a result, extra days of project work have been lost while asbestos abatement is halted and lead contamination must now be abated. This incident further demonstrates that [MBC] has failed to meet its obligations and continues neither to meet the contract schedule nor to properly manage its subcontractors (id. at 2-3).
DEC issued several citations to Classic for the unpermitted discharge of lead-contaminated water into State waters (see NYSCEF Doc No. 190), and the record reflects that Classic paid fines for these environmental violations (see NYSCEF Doc No. 184 at 66).
The Court is satisfied that the foregoing proof demonstrates, prima facie, that Classic materially breached the Subcontract by causing the Lead Incident, which amounted to a breach of Classic's obligations to "keep the Project site free from . . . unsafe conditions" (Classic Subcontract, art 2, § 4) and to "comply with all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction over Project" (id., § 7). 
Classic's opposition fails to raise a triable issue of fact or legal defense to liability for this breach. Classic admits that it was "testing a jet washer (which was authorized for final cleaning) on the 3rd floor of Building 4" immediately prior to the Lead Incident, and, later that day, "an inspector saw water orange in color on the 3rd floor that appeared [to] be draining out of Building 4. The same color water was noticed outside Building 4 entering a storm drain" (NYSCEF Doc No. 244 ["Perrault Opp. Aff."], ¶ 109). Thus, Classic does not deny causing the Lead Incident and, in essence, admits it.
Classic further insists that the Lead Incident "has been blown way out of proportion by MBC and OGS" (id., ¶ 126), arguing that "the lead water spill was entirely cleaned up within a 'few days'" (id., ¶ 128, quoting NYSCEF Doc No. 275 at 10). "This results in the inescapable conclusion that this minor incident which was cleaned up within a few days was used as a justification to finally terminate MBC from the Project once and for all — a process which was started in December of 2017 when MBC was first held in default on the Project" (id., ¶ 129).
Classic's attempt to minimize the seriousness of the Lead Incident is unconvincing. As Classic itself observed, OGS considered the Lead Incident to be "'catastrophic'" (NYSCEF Doc No. 278 at 3; see NYSCEF Doc No. 276, ¶ 63). There simply is no way to view Classic's persistent misuse of a pressure washer and its role in causing the spread of lead-contaminated water throughout the Building and into State waters, in violation of environmental laws, to be anything other than a material breach of the Subcontract.
The Court therefore concludes that Classic's material breach precludes it from maintaining an affirmative claim for breach of the Subcontract against MBC. 
B. CPLR 3016 (f) (Second Cause of Action)
Classic also seeks to recover the unpaid contract balance under CPLR 3016 (f), which "provides in relevant part that, where the plaintiff in an action involving the 'performing of labor or services' sets forth 'the items of [its] claim and the reasonable value or agreed price of each,' the defendant, in [its] answer, must 'indicate specifically those items [it] disputes'" (Anderson & Anderson, LLP-Guangzhou v Incredible Invs. Ltd., 107 AD3d 1520, 1522 [4th Dept 2013], quoting CPLR 3016 [f]). "Failure to make such specific denials constitutes an admission of the schedule's items and may constitute a sufficient basis for granting summary judgment to the plaintiff" (Empire State Fuel Corp. v 2683 Morris Assoc., LLC, 31 Misc 3d 40, 42 [App Term, 2d Dept 2011] [citations omitted]).
Classic's complaint attaches and incorporates by reference a listing of the dates of its payment applications, the work performed, the value of the materials and labor supplied, and the payments made and due (see Complaint, Ex. A; Virginia Blue Ridge Ry. v Seeley, 33 AD2d 871, 871 [3d Dept 1969]; cf. Teal, Becker & Chiaramonte, CPAs v Sutton, 197 AD2d 768, 769 [3d Dept 1993]). MBC therefore was obliged "to specify in [its] answer 'those items [it] disputes and whether in respect of delivery or performance, reasonable value or agreed price'" (Netguistics, Inc. v Coldwell Banker Prime Props., Inc., 23 AD3d 719, 719-720 [3d Dept 2005], quoting CPLR 3016 [f]). 
In its amended answer (see NYSCEF Doc No. 178), MBC specifically "den[ies] . . . that [Classic] properly performed or furnished the labor, services and/or materials identified in [the pay applications]," further "den[ies] the alleged agreed upon value and price thereof," and specifically identifies the disputed items (id. at 3-11). As the Court previously held in denying Classic's early motion for summary judgment, "'[t]his degree of specificity [i]s sufficient' to meet the statutory requirements" (NYSCEF Doc No. 78 at 7, quoting County Excavation, Inc. v Middleton, 90 AD2d 660, 661 [3d Dept 1982]). 
Given MBC's demonstrated compliance with the pleading requirement of CPLR 3016 (f), Classic's second cause of action must be dismissed.
C. Account Stated (3rd Cause of Action)
Next, Classic seeks to recover the unpaid contract balance under an account-stated theory, alleging that, "despite [MBC's] receipt of [its] payment applications, there has never been any objection or objections stated thereto by MBC" (Classic Complaint, ¶ 22).
An account stated is "an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due," which "may be implied from the retention of an account rendered for an unreasonable period of time without objection and from the surrounding circumstances. When no timely objection is raised after an account is presented, silence is deemed acquiescence and warrants enforcement of the implied agreement to pay" (Haselton Lbr. Co., Inc. v Bette & Cring, LLC, 123 AD3d 1180, 1181 [3d Dept 2014] [internal quotation marks and citations omitted]; see Auburn Custom Millwork, Inc. v Schmidt & Schmidt, Inc., 148 AD3d 1527, 1533 [4th Dept 2017]). 
MBC paid Classic's first three applications (see NYSCEF Doc No. 276, ¶ 75), and the remaining applications were submitted on and after October 31, 2017 (see id., ¶ 78). By that time, Classic's workers had been ousted from the Project (see NYSCEF Doc No. 200), Classic had been cited for causing the Lead Incident (see NYSCEF Doc No. 201), and OGS had ordered MBC to halt its already-delayed abatement work "to prevent further spreading of [the] potential lead contamination" (NYSCEF Doc No. 202). Those efforts "failed" (NYSCEF Doc No. 205 at 1), and OGS was left questioning Classic's "expertise and qualifications" to perform abatement work (NYSCEF Doc No. 206 at 4). And on November 13, 2017, OGS terminated the Prime Contract due to MBC's failure to properly manage Classic relative to the Lead Incident, among other things (see NYSCEF Doc No. 207 at 2-3).
No reasonable trier of fact presented with these circumstances could find an implied agreement by MBC to make further payments to Classic. The third cause of action therefore is dismissed.
D. Unjust Enrichment (4th Cause of Action)
Classic seeks to recover the unpaid contract balance under a quasi-contractual theory, alleging that MBC was unjustly enriched by the labor and materials it supplied to the Project (see Classic Complaint, ¶ 25). However, Classic's services were rendered pursuant to the Subcontract, which is a valid and enforceable agreement, and Classic's allegations of non-payment fall squarely within the Subcontract's scope. As such, Classic's quasi-contractual claim is barred by the Subcontract (see Part II [F], supra). 
E. Trust Fund Diversion (5th and 6th Causes of Action)
Classic's claims sounding in trust fund diversion are dismissed due to its failure to timely move for and obtain class certification (see Part II [D], supra).
F. Payment Bond (7th Cause of Action)
In the absence of a viable claim for recovery against MBC, Classic cannot maintain a claim against the Bond posted by Travelers.
VI. MOTIONS DIRECTED AT THIRD PARTY COMPLAINT IN ACTION 1
MBC and Travelers do not allege any counterclaims in Action No. 3 (see NYSCEF Doc No. 178). Rather, their claims for affirmative relief against Classic appear in the second amended third-party complaint filed in Action No. 1 (see NYSCEF Doc No. 179 ["Third Party Complaint"]).
MBC moves for partial summary judgment on its claim for breach of the Classic Subcontract, and Travelers moves for partial summary judgment on its claim to recover excess completion costs (see NYSCEF Doc No. 175). 
Classic also moves for partial summary judgment in the Third Party Action, seeking an order "[d]ismissing all of the damages sought by [MBC and Travelers in their Third Party Complaint] for completing the [Project] pursuant to the [Bond] and takeover agreement," and [*23]"[a]ffirming statements and positions made by [MBC and Travelers] in the Court of Claims [Case]" (NYSCEF Doc No. 221).
A. Breach of Subcontract (1st MBC Claim)
MBC alleges that Classic breached the Subcontract by causing the Lead Incident and failing to timely perform its work (see Third Party Complaint, ¶¶ 58-69). "Because of Classic's breaches, including the multitude of delays caused by Classic, and the [Lead Incident], MBC was terminated by OGS and has suffered substantial loss, which continues to accrue" (id., ¶ 61).
1. The Lead Incident
The Court has determined that Classic materially breached the Subcontract, a valid and enforceable agreement, by causing the Lead Incident (see Part V [A], supra). Further, MBC submits proof of its own performance under the Subcontract (see NYSCEF Doc No. 276, ¶ 75). Accordingly, the burden shifts to Classic to raise a legal or factual defense to liability.
Classic contends that MBC is precluded from maintaining a claim under the Subcontract because it was the first to materially breach. Classic argues that, at the time of the Lead Incident, MBC already was in material breach for: (i) failing to supply Classic with a Baseline Schedule; (ii) insisting that Classic remove the Yellow Glue, even though such work was excluded from the Subcontract; and (iii) demanding an accelerated schedule (see NYSCEF Doc No. 277 at 5-18).
Classic's reliance on MBC's alleged prior material breaches is barred by the same election-of-remedies principles discussed in Parts II (B) and III (B), supra. Classic was aware that it had not received a Baseline Schedule for the entire Project and that MBC had demanded that it perform the extra-contractual removal of Yellow Glue and work at a "blistering" pace. Nonetheless, Classic did not declare a default or notify MBC that it was in material breach. Rather, Classic elected to continue to tender its own performance under the Subcontract and accept MBC's performance, including payment of Classic's first three pay applications.
In any event, Classic has not raised a triable issue of fact as to MBC's alleged prior material breaches. The Subcontract required Classic to perform under a schedule established by MBC, and it did not oblige MBC to supply a Baseline Schedule (see Part II [A] [3], supra). Further, Classic has not identified any contractual provision that was breached by MBC's insistence that it remove Yellow Glue "on a time and material basis, even though [the parties] explicitly excluded [such work] from the [Subcontract]" (Perrault Opp Aff., ¶ 98). The same is true of Classic's allegation that it was directed "to perform the work at a blistering pace" (id., ¶ 141; see Subcontract, art 3, § 2 [giving MBC the right to determine the pace of Classic's work]).
2. Delay
MBC has not demonstrated its prima facie entitlement to partial summary judgment on allegations that Classic breached the Subcontract by causing a "multitude of delays" (Third Party Complaint, ¶ 61). MBC signed the Subcontract on September 13, 2017, when MBC was already behind schedule, and OGS terminated the Prime Contract on November 13, 2017, just two months later. MBC's moving papers do not identify the "multitude of delays" during this short period that were caused or contributed to by Classic. 
3. Termination of Prime Contract
Insofar as MBC's motion is intended to establish on summary judgment that the termination of the Prime Contract "and the significant cost of funding a surety takeover . . . was necessitated by a failure to Classic to complete the work in a timely, workmanlike manner as [*24]required by the Subcontract" (id., ¶ 62), the Court concludes that MBC has not demonstrated an entitlement to such relief.
The proof relied upon by MBC itself raises factual questions as to whether OGS's termination of the Prime Contract was attributable to MBC's own "fail[ure] to ensure timely and competent completion of the abatement work and to prevent ongoing deficiencies and violations" by "properly manag[ing] its subcontractors," including Classic (NYSCEF Doc No. 207 at 2-3). 
In any event, issues concerning the basis for OGS's termination of the Prime Contract and the propriety of that termination are pending before the Court of Claims, and it would not be appropriate for this Court to attempt to determine those issues, particularly in the absence of OGS's participation.
4. Conclusion
Classic breached the Subcontract by causing the Lead Incident, and MBC is entitled to partial summary judgment on its first cause of action to that limited extent.
B. Excess Completion Costs (1st Travelers Claim)
Travelers moves for partial summary judgment on its first cause of action, which seeks recovery of the "substantial costs Travelers incurred as a result of Classic's conduct, which led to OGS's termination of [MBC] from the Project" (NYSCEF Doc No. 220 at 23). For the reasons stated in Part VI (A) (3), supra, Travelers' motion is denied.
C. Classic's Motion
Classic moves for an order "[d]ismissing all of the damages sought by [MBC and Travelers] for completing [the Project] pursuant to the [Bond] and takeover agreement," and "[a]ffirming statements and positions made by [MBC and Travelers] in the Court of Claims [Case]" (NYSCEF Doc No. 221). 
1. "Wrongful Termination"
Classic argues that it is not responsible for the costs incurred by MBC and Travelers in completing MBC's work under the Prime Contract because such costs "were caused by OGS' wrongful termination of MBC" (NYSCEF Doc No. 242 ["Classic MOL"] at 14). According to Classic, OGS's improper termination of MBC's Prime Contract resulted in the improper termination of Classic's Subcontract with MBC (see id. at 6-14). Thus, "based upon MBC/Travelers' extensively argued and proven position in the Court of Claims, OGS is liable for all of MBC/Travelers' costs incurred to complete the Project" (id. at 14).
Initially, the Court observes that MBC and Travelers' claim of wrongful termination is pending in the Court of Claims, and their allegations against OGS have not been "proven" (id.) or "definitively establish[ed]" (id. at 13). And it would not be proper for this Court to attempt to adjudicate issues that are sub judice in the Court of Claims Case based on MBC and Travelers' filings in that case, particularly since OGS is not a party to these consolidated actions and has not had the opportunity to be heard.
If the Court of Claims ultimately determines that OGS wrongfully terminated the Prime Contract, then MBC and Travelers will be entitled to pursue recovery of the completion costs engendered by the wrongful termination. That potential monetary recovery may reduce or eliminate MBC and Travelers' financial responsibility for completion costs, thereby reducing or eliminating the completion-cost damages sought from Classic herein (see NYSCEF Doc No. 278 at 17-18 [acknowledging that MBC and Travelers "cannot recover twice"]). On the other hand, if the Court of Claims determines that OGS is not liable for damages, MBC and Travelers will [*25]bear the full weight of the completion costs and they may pursue the recovery of such costs as a measure of damages under the contractual and other theories alleged in their Third Party Complaint.[FN29]

Additionally, the "wrongful termination" argument fails because Classic has been determined to be liable to MBC for the damages caused by the Lead Incident (see Parts V [A], VI [A], supra), and Classic has not affirmatively demonstrated that the completion costs sought by MBC and Travelers fall outside the scope of their recoverable damages on the claim.
Finally, Classic argues in reply that MBC did not follow the contractually-required process to terminate the Subcontract for cause (see NYSCEF Doc No. 310 at 10). However, Classic did not allege a wrongful termination claim, and, even if it had, the claim would be barred by Classic's own prior material breach. And, in any event, given that the Prime Contract was incorporated into the Subcontract, and OGS's termination of the Prime Contract operated to terminate the Subcontract, MBC was not called upon to make an election of remedies.[FN30]

Based on the foregoing, OGS's alleged improper termination of the Prime Contract does not provide a basis for denying MBC and Travelers the right to pursue the recovery of completion costs as a measure of damages on their affirmative claims against Classic.
2. Judicial Estoppel
Classic argues that MBC and Travelers are judicially estopped from taking positions in this action contrary to those they have taken in the Court of Claims Case. Specifically, Classic asserts that MBC and Travelers should be estopped from arguing that anyone other than "OGS is liable for all of their damages on the Project" (Classic MOL at 16).
The doctrine of judicial estoppel precludes a party "from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position" simply because its interests have changed (Maas v Cornell Univ., 253 AD2d 1, 5 [3d Dept 1999], affd 94 NY2d 87 [1999]; see Kilcer v Niagara Mohawk Power Corp., 86 AD3d 682, 684 [3d Dept 2011]). "'In order for judicial estoppel to be invoked, (1) the party against whom it is asserted must have advanced an inconsistent position in a prior proceeding, and (2) the inconsistent position must have been adopted by the court in some ma[nn]er'" (Fletcher v Rodriguez, 47 Misc 3d 582, 587 [Sup Ct, Queens County 2015], quoting Peralta v Vasquez, 467 F3d 98, 105 [2d Cir 2006]; see Hinman, Straub, Pigors & Manning v Broder, 124 AD2d 392, 393 [3d Dept 1986]). 
Contrary to Classic's contentions, there is nothing inconsistent about MBC and Travelers pursuing recovery from OGS for the alleged wrongful termination of the Prime Contract, while, at the same time, pursuing recovery of the damages caused by Classic's breach of the Subcontract, an entirely different agreement. There may be overlapping damages, but "[MBC and Travelers] are not seeking double recovery" (NYSCEF Doc No. 278 at 3 n 3).
And even if there were some inconsistency, the Court of Claims has not adopted the positions taken by MBC and Travelers regarding the alleged wrongful termination of the Prime Contract. Simply "advanc[ing] a years-long lawsuit against the State of New York" (Classic MOL at 16) is not a benefit in its own right (cf. Northacker v County of Ulster, 212 AD3d 86, 91 [3d Dept 2022]), and Classic's assertion that MBC and Travelers "are now positioned to recover a judgment [from OGS] in excess of $20 million" is speculative (NYSCEF Doc No. 310 at 12).
3. "Voluntary" Payments
Finally, Classic argues that MBC and Travelers voluntarily assumed the obligation to pay the costs of completing MBC's work under the Prime Contact, despite knowing "months ahead of time that MBC had been wrongfully terminated by OGS and that Travelers had no obligation to complete the Project" (Classic MOL at 17). "Classic cannot be liable for damages which MBC/Travelers voluntarily incurred in completing the Project" (id.).
Classic's voluntary-payment argument lacks merit. Travelers' takeover agreement with OGS (see NYSCEF Doc No. 304 ["Takeover Agreement"]) was made with a full reservation of rights, and the parties thereto agreed and acknowledged "that no waiver of any rights[,] claims, remedies and defenses is agreed to, implied, or intended" (id. at 4). 
Moreover, Classic's argument rests on the false premise that Travelers "knew" that OGS's termination of MBC's Prime Contract was wrongful (Classic MOL at 17). MBC and Travelers believe that MBC was wrongfully terminated, and Classic may share that belief, but OGS plainly believes otherwise. The propriety of MBC's termination will be "known" only after a final judgment is rendered in the Court of Claims Case.
It also bears emphasis that Travelers' conduct in entering into the Takeover Agreement was fully consistent with basic principles of suretyship law, which give "the surety . . . the option of paying the obligee under the bond its damages, essentially the obligee's cost of completion" (Granite Computer Leasing Corp. v Travelers Indem. Co., 894 F2d 547, 551 [2d Cir 1990]). And, as Travelers observes, the adoption of Classic's position would "send a message to the surety industry not to complete projects where the termination is disputed, which happens frequently" (NYSCEF Doc No. 278 at 19-20).
CONCLUSION
For all of the foregoing reasons, it is
ORDERED that SCE's third through seventh causes of action in Action No. 1 are dismissed; and it is further
ORDERED that SCE's first, second and eighth causes of action in Action No. 1 are limited to the extent indicated herein; and it is further
ORDERED that MBC is entitled to partial summary judgment as to liability in Action No. 1 as to its first, second (as limited), third and sixth counterclaims; and it is further
ORDERED that MBC is entitled to summary judgment on its fourth counterclaim in Action No. 1 in the sum of $110,584.56; and it is further
ORDERED that MBC's eighth and ninth counterclaims in Action No. 1 are dismissed; and it is further
ORDERED that MBC and Travelers' first joint counterclaim in Action No. 1 is limited to the extent indicated herein; and it is further
ORDERED that MBC and Travelers' second joint counterclaim in Action No. 1 is dismissed; and it is further
ORDERED that the dispositive motions in Action No. 1 are granted to the extent indicated in the preceding seven decretal paragraphs and are otherwise denied; and it is further
ORDERED that Oak's fourth, fifth and seventh causes of action in Action No. 2 are dismissed; and it is further
ORDERED that Oak's sixth cause of action in Action No. 2 is limited to the extent indicated herein; and it is further
ORDERED that the dispositive motions in Action No. 2 are granted to the extent indicated in the preceding two decretal paragraphs and are otherwise denied; and it is further
ORDERED that Classic's complaint is Action No. 3 is dismissed; and it is further
ORDERED that MBC is entitled to partial summary judgment on its first third-party claim in Action No. 1 to the extent indicated herein; and it is further
ORDERED that MBC and Travelers' motion in Action No. 3 directed at the Classic Complaint filed therein and the Third Party Complaint filed in Action No. 1 is granted to the extent indicated in the preceding two decretal paragraphs and is otherwise denied; and it is further
ORDERED that Classic's motion in Action No. 3 directed at the Third Party Complaint in Action No. 1 is denied in all respects; and it is further
ORDERED that plaintiffs in each of the above actions shall promptly file a note of issue and certificate of readiness if they have not done so already; and it is further
ORDERED that all counsel shall appear for an in-person status conference on Tuesday, January 19, 2024 at 10:30 a.m. in the Albany County Courthouse; and it is finally it is
ORDERED that, in advance of the conference, counsel shall confer with their clients and each other regarding: (i) willingness to participate in mediation/ADR in advance of trial; (ii) the extent to which these actions should be the subject of a joint trial; (iii) the extent to which the trial(s) of these actions should await determination of the Court of Claims Case.
This constitutes the Consolidated Decision & Order of the Court, the original of which is being uploaded to NYSCEF for electronic entry by the Albany County Clerk. Upon such entry, counsel for MBC shall promptly serve notice of entry in each action.
Dated: Albany, New York
December 4, 2023
RICHARD PLATKIN
A.J.S.C.
Papers Considered:
Action No. 1: NYSCEF Doc Nos. 372-565;
Action No. 2: NYSCEF Doc Nos. 111-146;
Action No. 3: NYSCEF Doc Nos. 175-317.

Footnotes

Footnote 1:Unless otherwise specified, NYSCEF references in this section shall refer to the docket in Action No. 1.

Footnote 2:Unless otherwise noted, references to the pleadings shall refer to the most amendments.
Footnote 3:Oak also sues SCE for the unpaid contract balance (see id.).

Footnote 4:References to the NYSCEF docket in Parts II and III shall refer to the docket of Action No. 1.

Footnote 5:The second paragraph of the Termination Letter identified additional deficiencies in SCE's performance but did not purport to rely on them as a basis for termination.

Footnote 6:The first page of the Subcontract describes the "Project" as "NYS GS Project No. 45124-C, Abate Hazardous Materials and Renovate Building No. 4, State Office Building Campus" (id.).

Footnote 7:Contrary to SCE's implicit contention, nothing in the Subcontract obliged MBC to show that "SCE was delaying the [entire] Project" to warrant its termination for cause (NYSCEF Doc No. 565 at 3).

Footnote 8:SCE makes much of MBC's argument in the Court of Claims Case that OGS materially breached the Prime Contract by failing to timely supply it with a Baseline Schedule. But OGS's obligations to MBC are defined by the terms of the Prime Contract, whereas MBC's obligations to SCE are defined by the Subcontract (see NYSCEF Doc No. 495, ¶¶ 13-14).
Footnote 9:Although MBC and SCE agree that the Yellow Glue was an unforeseen condition, OGS has taken a contrary position in the Court of Claims Case (see NYSCEF Doc No. 431 at 15 n 4).

Footnote 10:Talerico makes the same averments in his affidavit of July 14, 2023 (see NYSCEF Doc No. 541, ¶¶ 6-11).

Footnote 11:For the reasons stated in Part III (B), infra, Oak's breach of its insurance obligation has not been shown to be a material breach. Accordingly, the timing of this breach is not relevant to whether SCE can maintain a claim against MBC for breach of the Subcontract.

Footnote 12:MBC's remaining claims of breach — that (i) SCE failed to pay its subcontractors, (ii) failed to ensure that all employees, including those of lower-tier subcontractors, were paid prevailing wages, and (iii) failed to ensure that Oak maintained adequate insurance — are addressed infra.
Footnote 13:In any event, nominal damages always are available in an action for breach of contract (see Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 402 [1993]).

Footnote 14:MBC has been granted partial summary judgment as to liability on its first counterclaim, including liability for the Flood Incident (see Part III [A], supra). Thus, the ninth counterclaim also fails under the principle that a party can obtain only one recovery for the same loss.

Footnote 15:SCE is obliged to indemnify MBC, OGS and OGS's "design professional" from all losses, costs, attorney's fees, damages and expenses arising from SCE's infringement of intellectual property rights (Subcontract, art 5, § 1). 

Footnote 16:SCE "will be responsible to [MBC] for any costs . . . which may be incurred by [MBC] because of [SCE's] failure to maintain safe working conditions" (id., § 2).
Footnote 17:SCE agreed to indemnify MBC and OGS for any losses, expenses, damages, injury or liability caused by violations of Labor Law §§ 240 or 241 (see id., § 7).
Footnote 18:SCE "agree[d] to indemnify, defend and hold harmless [MBC] from any and all damages, losses or expenses arising from or relating to claims that [SCE], or any lower tier subcontractor . . . , violated the prevailing wage law" (id., § 8; see Part III [D], supra).

Footnote 19:As SCE observes, however, it does appear that the bulk of the losses and expenses for which MBC seeks indemnification under Section 5.4 do not involve injuries to person or property.

Footnote 20:If Section 3.5 were construed to extend indemnification for delay damages to intra-party claims, the following language of Section 3.3 would be rendered superfluous: "Time is of the essence on the part of [SCE], 
and in the event that [SCE] shall fail to complete the Work to be performed under this Subcontract, by and at the completion date, [SCE] shall pay to [MBC], as and for liquidated damages, and not as penalty, the sum of zero dollars ($0.00) per day, which sum, in view of the difficulty of estimating such damages with exactness, is hereby expressed, fixed, computed, determined and agreed upon by the parties to this Agreement that the liquidated damages specified are in lieu of the actual damages arising from such breach of this Agreement and that [MBC] shall have the right to deduct such liquidated damages from any moneys otherwise due or to become due to [SCE]."
 

Footnote 21:The remaining claims in the Oak Complaint are alleged against SCE, who has not moved against them.

Footnote 22:References in Part IV to the NYSCEF docket shall refer to the docket of Action No. 2.
Footnote 23:Oak says the foregoing "is not within [its] knowledge" (id.), but it had a full opportunity to engage in disclosure.
Footnote 24:In other words, Oak had no expectation of compensation from MBC, other than a claim under the Bond.

Footnote 25:"To prevail on a claim of replevin, a plaintiff must demonstrate that he or she owns specified property, or is lawfully entitled to possess it, and that the defendant has unlawfully withheld the property from the plaintiff" (Stewart Family LLC v Stewart, 184 AD3d 487, 490 [1st Dept 2020]).

Footnote 26:Indeed, regarding retainage, Travelers has not even met its initial burden.

Footnote 27:References in Parts V and VI to the NYSCEF docket shall refer to the docket in Action No. 3.
Footnote 28:Hereinafter, references in the text to "Subcontract" shall refer to the Classic Subcontract.

Footnote 29:The Court expresses no view on the legal sufficiency of claims or damages theories that were not expressly made part of the instant motion practice.

Footnote 30:The Court observes that Article 10 of the Subcontract, which authorized MBC to terminate Classic for convenience on two days written notice (see Subcontract art 10, § 1), expressly contemplated the situation where "[OGS's] contract with [MBC] has been terminated" (id., § 2). In that circumstance, "[MBC's] liability to [Classic for terminating for convenience] shall be limited to the amount [MBC] recovers from [OGS] on [Classic's] behalf in accordance with Prime Contract" (id.).